J-S30009-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| R.L.H., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| L.C., | |
| Appellee | No. 2100 MDA 2016 |

Appeal from the Order Entered October 31, 2016
In the Court of Common Pleas of York County
Civil Division at No(s): 2010-FC-001740-03

BEFORE: SHOGAN, RANSOM, and MUSMANNO, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED JUNE 22, 2017**

R.L.H. ("Father") appeals *pro se* from the October 31, 2016 order awarding him shared legal and physical custody of his minor children, E.S.H., a son born in 1999, S.S.H., a daughter born in September of 2001, B.C.H., a daughter born in 2003, and A.A.H., a son born in 2005 (collectively "the Children").[1] The order directed that Father was to share custody with L.C., the Children's mother ("Mother").[2] The order specified that Mother would have primary physical custody of E.S.H., S.S.H., and A.A.H., with partial physical custody awarded to Father, and Father would have primary

---

[1] N.T., 10/26/16-10/27/16, at 10.

[2] Father also has a five-year-old son with his current wife, E.H., ("Stepmother"). N.T., 10/26-27/16, at 50, 73. The five-year-old son is not a party and did not participate in these proceedings. ***Id.***

physical custody of B.C.H., with partial physical custody awarded to Mother.

After careful review, we affirm.

This Court previously set forth the factual background of the custody

litigation between Mother and Father as follows:

> Mother and Father were married in 2001 and separated in 2008. The parties have four minor children, E.H., S.H., B.H., and A.H. (collectively, "the Children"). Father originally filed for custody in 2007, shortly after Mother left Dauphin County for York County. Father resided in Dauphin County, and filed for custody in that jurisdiction. It appears that the matter was settled by agreement at conciliation on December 11, 2007, providing Mother with majority physical custody and Father with significant time every weekend. This [c]ourt does not have access to the complete Dauphin County records, however, numerous Dauphin County documents were clocked into the York County file when the matter was referred to that jurisdiction on September 17, 2010.

> Early in 2009, Father filed an emergency petition to modify custody. The matter was ultimately tried before the Hon. Judge Todd Hoover of the Dauphin County Court of Common Pleas with an order entered July 6, 2009. The order modified custody only slightly, and majority custody remained in Mother. Father immediately filed an appeal in Superior Court, which ultimately affirmed Judge Hoover's order on March 12, 2010. On the same day, Father filed a new petition for emergency custody in Dauphin County, along with a petition to preclude Judge Hoover from hearing the case as he had "shown judicial bias." ...

> Without the Dauphin County file, the trial court is unable to determine precisely how the case was transferred, but the matter ultimately found its way to York County, with a significant number of Dauphin County orders docketed in York County's Prothonotary's file on September 17, 2010. The

matter was tried before the Hon. Judge Clarence N. Patterson on January 25, 2011, with an order entered on February 9, 2011, confirming majority physical custody in Mother.

At that time, because of concerns developed during the course of the trial that Father had significant anger issues, Judge Patterson ordered Father to enter into a program of anger management within 30 days of the court order and, upon completion of the same, to file with the trial court a certificate of attendance. Father again appealed to the Superior Court, which affirmed the decision of Judge Patterson on November 29, 2011.

On March 19, 2012, Father again filed a petition to modify custody seeking to re-litigate all issues from 2007, which initiated the instant matter. Father also filed a petition for civil contempt against Mother on July 23, 2012, which was ordered to be addressed at the trial in the custody matter. As a result of the death of Judge Patterson, the matter was tried before the Hon. Harry M. Ness on November 30, 2012. After significant discussion, Father agreed to proceed only on those issues arising since the last order of court, as all of the other issues had been litigated and ruled upon. At this time, Father also agreed to withdraw his petition for civil contempt against Mother.

*R.H. v. L.H.*, ___A.3d___, ___, 130 MDA 2013 (Pa. Super. filed September 10, 2013) (unpublished memorandum at 1-2) (quoting Trial Court Opinion, 12/17/2012, at 1-3).

In the amended custody order entered December 18, 2012, the trial court awarded shared legal custody of the Children to the parties, primary physical custody to Mother, and partial physical custody to Father. This Court affirmed the order based upon the finding that Father had failed to

preserve his claims pursuant to Pa.R.A.P. 1925(a)(i)(2) and (b). The December 18, 2012 order provided that Father was to have partial physical custody of all four children on alternating weekends. The parties would alternate physical custody on weekends, and Father was to have physical custody on alternating weeks during the summer. Each parent was to confer with the other on all matters of importance relating to the Children's health. The parents were to listen carefully and consider the wishes of the Children in addressing any parenting issues.

The parties do not dispute that, in early 2015 when S.S.H. was thirteen years old, she became pregnant by the son ("Stepbrother") of Mother's then paramour, now husband ("Stepfather"). Stepbrother was fourteen years old at the time. At the time of the pregnancy, both Stepbrother and Stepfather were residing with Mother and the Children. Upon learning of the pregnancy, York County Children Youth and Families ("CYF") conducted an investigation. Mother took S.S.H. to Philadelphia, where the child had an abortion. Subsequently, S.S.H. has remained in Mother's home, where Stepfather continues to reside. Stepbrother has moved into his grandmother's home. Since the entry of the December 18, 2012 custody order, B.C.H. began residing with Father, who assumed primary physical custody of the child, with Mother's agreement. On June 29,

2016, Father filed a petition to modify custody and a petition for contempt against Mother.[3]  In the petition to modify, Father asserted the following:

> While in the [M]other's continuous unsupervised care, many things have continued to happen against the "Best Interest" of the [C]hildren.  And though I the father have fought to avoid such things, it has been brought to me [sic] attention that my daughter was sexually assaulted while in her mother's home by [M]other's paramour's child, and impregnated through the assault, and then transported to Philadelphia to terminate this pregnancy to cover up this act.
>
> WHEREFORE, Petitioner requests your Honorable Court to modify the Custody Order as follows: Father shall be given full custody of the younger two children, the older two children shall remain with [M]other.  Though [F]ather is more than willing to have all four of his children, it is likely that his 14 and 17 year old continue to rebel and bring more upset than relief to their lives.  At this time this is the father's request, and any other relief as your Honorable Court deems just.

Petition to Modify, 6/29/16, at 2.  Thus, in the petition for modification, Father sought primary physical custody of B.C.H. and A.A.H., but not necessarily E.S.H. and S.S.H.  The trial court held an evidentiary hearing on the modification petition on October 26, 2016, and October 27, 2016.

At the hearing, the parties acted *pro se*.  Father first presented the testimony of Kristy Rivera, S.S.H.'s therapist, who did not testify concerning S.S.H.'s treatment due to patient confidentiality.  N.T., 10/26-27/16, at 8-14.  With the agreement of the parties, the court then questioned the four

_____

[3]  On December 29, 2016, the trial court denied Father's petition for contempt.  Father did not appeal the order denying his petition for contempt, and it is not before this Court on appeal.

children individually, in the courtroom, in the presence of the parties. *Id.* at 18. When the court completed its questioning of the Children, Father requested that the trial court return his papers to him on which he had typed questions he had planned to ask the Children. *Id.* at 50. The court returned the papers to Father and, with the agreement of Father and Mother, did not make them part of the record. *Id.*

Father then questioned Cynthia Sindlinger, the program specialist at CYF. N.T., 10/26-27/16, at 51. Ms. Sindlinger testified concerning the CYF investigation into the allegations that Stepbrother had sexually abused S.S.H. *Id.* at 52-57. Ms. Sindlinger also testified concerning prior CYF investigations of the Children in Mother's care. *Id.* at 52-61. Ms. Sindlinger testified that the assigned caseworker had gone to S.S.H.'s school on March 22, 2016, after S.S.H. stated that she was engaging in self-harm in the form of cutting her arm because she did not want to be in Father's physical custody. *Id.* at 61-63.

Next, Father questioned Detective Robert Ryman of the Northern York County Regional Police Department regarding the police investigation into the allegations that Stepbrother had sexually assaulted S.S.H. and that Mother had taken S.S.H. to Philadelphia for an abortion. N.T., 10/26-27/16, at 66-67. When Detective Ryman spoke with Mother and asked her about S.S.H., Mother initially responded that "nothing really is going on." *Id.* at 67. When Detective Ryman asked about Mother taking S.S.H. to

Philadelphia to have an abortion, Mother responded, "Oh, that." *Id.* She then related the details of the matter to Detective Ryman. *Id.* After an investigation, the District Attorney's Office closed the case. *Id.* at 67-68. In January of 2016, the police received another report that Stepbrother was telling people at school that he was having sex with S.S.H., and students were teasing S.S.H. *Id.* at 68. Police investigated the complaint, and S.S.H. informed them that she wanted the matter concluded and for Stepbrother to get help. *Id.* at 69. On February 11, 2016, Stepbrother was charged with a number of criminal offenses, but Detective Ryman was uncertain of the outcome. *Id.* at 69-70. Detective Ryman said that since his investigation in January of 2016, there was an allegation that Stepbrother had come into S.S.H.'s room, exposed himself, and climbed into bed with her. *Id.* Both juveniles were fourteen years old at the time. *Id.* To clarify his testimony, Detective Ryman stated that Mother was not initially forthcoming about the fact that she had taken S.S.H. to Philadelphia to have an abortion. *Id.* at 71.

Father then presented the testimony of his wife ("Stepmother"). N.T., 10/26-27/16, at 73. Stepmother described an incident in which Mother and Stepfather came to Father's home to take custody of the Children, and Stepfather allegedly assaulted Father, resulting in criminal charges against Stepfather. *Id.* at 82-84.

Next, Mother presented the testimony of Stepfather, through questioning by the court. N.T., 10/26-27/16, at 102. Stepfather testified that Stepbrother was fifteen years old at the time of the hearing and was fourteen years old at the time of the sexual assault on S.S.H. N.T., 10/26-27/16, at 106. As a result of the criminal charges against him, Stepbrother was found to have engaged in indecent contact, and he was placed on probation for one year. *Id.* at 107. Stepbrother was in therapy at the time of the hearing and was instructed not to have any contact with S.S.H. as a term of his probation. *Id.* As noted, Stepbrother now lives with his grandmother, but he attends the same high school as S.S.H. *Id.* at 107, 119-120. Stepfather stated that pursuant to a court order, Stepbrother must be kept away from S.S.H. until he has completed his counseling and therapy. *Id.* at 109-110.

Mother then questioned Stepfather. N.T., 10/26-27/16, at 109. Stepfather explained the incident for which he was criminally charged with simple assault in relation to his altercation with Father. *Id.* at 110-112. Stepfather testified that all of the Children have anxiety relating to going to Father's house, with the exception of B.C.H. *Id.* at 112-113. S.S.H. has stated to him that she was cutting herself because of her anxiety over being at Father's home. *Id.* at 112.

On October 27, 2016, Father presented the testimony of Vanessa Cattano, Mother's previous landlord. N.T., 10/26-27/16, at 125,

129-130. Ms. Cattano testified that during the ten years that Mother lived in the building she managed, eviction proceedings previously had been brought against Mother on many occasions, which did not result in her eviction, because Mother always eventually paid her late rent. *Id.* at 129-131. Mother was eventually evicted in August 23, 2016. *Id.* at 131. Father then presented the testimony of Mother's mother, regarding the fact that Mother, Stepfather, E.S.H., S.S.H., and A.A.H., were staying with her in her one-bedroom apartment at the time of the hearing. *Id.* at 133-134.

Finally, Father and Mother testified on their own behalf, questioned by the trial court. N.T., 10/26-27/16, at 177, 203. Father also questioned Mother. *Id.* at 232.

In the October 31, 2016 order, the trial court awarded Mother and Father shared legal custody of the Children, with Mother having primary physical custody of E.S.H., S.S.H., and A.A.H., and Father having primary physical custody of B.C.H. During the school year, the parties were to share physical custody of the Children on alternate weekends, so that the Children would be together on all weekends. In the summer, Mother and Father were each to have custody of all four children on alternating weeks.

On December 1, 2016, Father timely filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court, however, entered an order on December 6, 2016, directing Father to file a concise statement within

twenty-one days.[4]  On December 27, 2016, Father filed a second concise statement, raising an additional issue.[5]

In his brief, Father raises the following issues for this Court's consideration:

> 1. Whether the trial court erred and abused its discretion by awarding the mother continued primary custody of the [C]hildren by misapplying and/or ignoring the factors outlined in 23 Pa.C.A.S. [sic] § 5328(a)?
>
> 2. Whether the trial court erred by repeatedly interfering with or just completely taking over the plaintiff's questioning and examination of the witness?
>
> 3. Whether the court erred by failing to give proper weight to the testimony of North Regional Police Detective Robert Ryman, when testifying to the Sexual Assault of child SSH by the son of [M]other's then paramour?
>
> 4. Whether the court erred by failing to give proper weight to the mother's untruthfulness regarding her knowledge of the sexual

---

[4]  In its Pa.R.A.P. 1925(a) opinion, the trial court explained that it issued this order because Father had left a numbered paragraph blank, and had failed to sign the concise statement.  Trial Court Opinion, 12/30/16, at 1.

[5]  The trial court explained that the issue was in addition to Father's completion of the paragraph that he had previously left blank.  Trial Court Opinion, 12/30/16, at 1.  We will not penalize Father for his filing his completed concise statement after his notice of appeal, as he complied with the trial court's order.  *See In re K.T.E.L.*, 983 A.2d 745 (Pa. Super. 2009) (finding that the appellant's failure to simultaneously file a Rule 1925(b) Statement did not result in waiver of all issues for appeal where the appellant later filed the Statement, and there was no allegation of prejudice from the late filing).  *Cf. J.P. v. S.P.*, 991 A.2d 904 (Pa. Super. 2010) (finding that the appellant waived issues for appeal by failing to comply with the trial court's order directing her to file a Rule 1925(b) Statement within 21 days).

assault, as well as her attempt to cover it up by taking the child to Philadelphia for an abortion of the products of said assault?

5. Whether the court erred to truly consider what is in the best interest of the [C]hildren when learning that while under investigation as a "Perpetrator by omission" for the sexual assault of SSH, [M]other decided to have a rushed wedding to [Stepfather,] the father of the perpetrator against child SSH?

6. Whether the court erred by failing to hold [M]other in contempt for her perjury, as well as child endangerment when she denied being informed by child SSH that she had attempted to overdose on medications when placed in plaintiff's home by CYFS [Children and Youth Family Services]?

7. Whether the court erred by failing to hold [M]other in contempt for withholding the [C]hildren from [Father] for a period of thirteen (13) [months] despite [Father's] attempts to exercise the previous order[?]

8. Whether the court erred by failing to hold [M]other in contempt for failing to comply with pretrial instructions as she did not: File a pretrial memorandum, File a parenting plan, Attend the Co-parenting class, nor did she attend the court appointed mediation[?]

9. Whether the court erred by failing to ask the [C]hildren the questions [Father] had written for the court to ask, only to then ask the same questions to the mother when the [C]hildren were no longer available for reexamination?

Father's Brief at 16.

In custody cases under the Child Custody Act ("the Act"), 23 Pa.C.S.

§§ 5321-5340, our standard of review is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses

first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted). We have stated:

The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting

*Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

In *M.A.T. v. G.S.T.*, 989 A.2d 11 (Pa. Super. 2010) (*en banc*), we stated the following regarding an abuse of discretion standard:

Although we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

*Id.* at 18-19 (quotation and citations omitted). "An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the

record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." *Bulgarelli v. Bulgarelli*, 934 A.2d 107, 111 (Pa. Super. 2007) (quotation omitted).

With any custody case decided under the Act, the paramount concern is the best interests of the child. *See* 23 Pa.C.S. §§ 5328, 5338. Section 5338 of the Act provides that, upon petition, a trial court may modify a custody order if it serves the best interests of the child. 23 Pa.C.S. § 5338. Section 5328(a) sets forth the best-interest factors that the trial court must consider. *See E.D. v. M.P.*, 33 A.3d 73, 80-81, n.2 (Pa. Super. 2011). Trial courts are required to consider "[**a**]**ll** of the factors listed in section 5328(a) . . . when entering a custody order." *J.R.M. v. J.E.A.,* 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original).

Section 5328(a) of the Act provides as follows:

**§ 5328.  Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

- 13 -

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328.

Furthermore, we have explained:

Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, "section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328(a) custody] factors prior to the deadline by which a litigant must file a notice of appeal." *C.B. v. J.B.,* 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013). . . .

In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.,* 63 A.3d 331, 336 (Pa. Super. 2013), *appeal denied*, [620 Pa. 710], 68 A.3d 909 (2013). A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d). *Id.*

*A.V. v. S.T.*, 87 A.3d 818, 822-823 (Pa. Super. 2014).

In issues one, three, and four, Father assails the trial court's consideration of Section 5328, the weight of the evidence, and Mother's credibility. In addressing these issues in its opinion, the trial court adopted its consideration of the Section 5328 factors that it provided on the record at the conclusion of the hearing on October 27, 2016. Trial Court Opinion, 12/27/16, at 1-7; N.T., 10/26-27/16, at 255-272. While lengthy, we

reproduce the trial court's on-the-record discussion as it aptly addresses

Father's issues. The trial court reasoned as follows:

> Now, I caution you that this is not a situation where I decide which factors favor which party, then add up the factors on each side and whoever has more factors wins. That's not the way it works. So be aware of that. Some factors have more weight in some cases than in others.
>
> So the first factor, which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> Frankly, from the evidence that I found credible, I don't think either one of you is particularly likely to encourage or permit that kind of contact. But I will say that [M]other has, without the necessity of court intervention, agreed that one of the [C]hildren, [B.C.H.], would basically be with [F]ather most of the time. So to that extent, the factor favors [M]other.
>
> But I again caution you, my impression of both of you, based upon the testimony I heard, is that, what can I say? You have, your relationship needs so much work that I'm not sure it could ever rise to the level of even being able to communicate as reasonable human beings regarding the best interests of your children. That's too bad. I wish that could be changed. At the present time, it is a nonexistent to negative relationship.
>
> The next factor is the present and past abuse committed by either party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can best provide adequate physical safeguards and supervision of the child.
>
> [W]ell, [S.S.H.] was abused by [S]tepbrother while in the physical custody and in the home of [M]other that resulted in a CYF investigation, at which time the other children in [M]other's household were placed with [F]ather for a period of time. The [C]hildren were then returned to [M]other and her custody to live in her household when CYF was satisfied that [S.S.H.] and the other children were no longer at risk of harm.

I'm satisfied that [M]other has taken appropriate steps, either because she has been ordered to or because she thought it was best, to make sure that [S]tepbrother had no contact with [S.S.H.]. By the same token, it must be said, if [S.S.H.] was living with [F]ather[,] the ability of [S]tepbrother to have contact with [S.S.H.] would be greatly reduced.

This was certainly a traumatic incident for [S.S.H.] and I think for both of her parents. I am satisfied that [S.S.H.] is safe with [M]other where she is now. I don't believe that [M]other is culpable for the abuse visited upon [S.S.H.] by [S]tepbrother, and I am satisfied that [M]other has taken appropriate steps to eliminate the risk of harm to [S.S.H.] by [S]tepbrother.

But it happened. There's no doubt in my mind that [F]ather would be vigilant, as I believe [M]other is. So I don't believe that that factor substantially favors either party.

The next factor is the information set forth in Section 5329.1(a) relating to consideration of child abuse and involvement with protective services.

[W]ell, both parents have a long history of involvement with CYF. I conclude, based upon the testimony that I've heard, that the complaints of one parent, about one parent have been made by the other parent, and vice versa, with the exception of the CYF investigation regarding abuse of [S.S.H.] by [S]tepbrother, I am satisfied that all of those other CYF investigations were determined by CYF to be unfounded.

Therefore, that factor favors neither party.

The next factor is the parental duties performed by each party on behalf of the [C]hildren. [W]ell, if we are just judging who has, who has performed more parental duties, by virtue of [M]other's majority physical custody of the [C]hildren, she has. But I am satisfied also that [F]ather, when the [C]hildren are in his custody, performs the parental duties that are necessary, and that if the [C]hildren were in his custody the same amount of time as [M]other, he would certainly fulfill those duties. I don't think the factor favors either party.

The next factor is the need for stability and continuity in the child's education, family life, and community life.

[W]ell, I think these children do need stability and continuity. I'm not sure there's any child that doesn't, and there is nothing in the evidence I have been presented that would indicate to me that these children are different in any of those ways.

Since the parents separated and stopped living together in one household, the [C]hildren have primarily lived with [M]other. They have gone to the same -- they have attended school in the same school district probably for their entire school careers. That would be [C]entral York. So certainly stability and continuity regarding education would favor [M]other.

I heard really nothing significant about the community life of the [C]hildren from either parent, and both parents have families. It's clear to me that up to the present most of the stability and continuity has been provided by [M]other's family. So that would be a change if the [C]hildren were to live with [F]ather primarily.

So that factor does favor [M]other.

The availability of extended family. Mother has a number of extended family members in the York area, particularly her grandparents, who the [C]hildren interact with probably on what I remember being a weekly basis, and I'm satisfied that on the various holidays the extended family celebrates those together and the [C]hildren are a part of that.

Father has no extended family close by. His family is in Georgia and Florida. There is certainly communication between his extended family and the [C]hildren. But it is simply by virtue of the distance, they are not as available as [M]other's extended family, so that factor does favor [M]other.

The [C]hildren's sibling relationships. I'm satisfied that the [C]hildren have pretty typical sibling relationships. I'm sure that they bicker and fight amongst themselves, but at the end of the day they spend a lot of time with each other and have formed typical sibling relationships, which are pretty close and the court believes pretty important.

We will say that they do have a half[-]sibling, and that is the child of [F]ather and his current wife, and I believe that in

the time [the] [C]hildren spend with [F]ather they are developing an affection for their little brother, or little half-brother, I should say, and that's an important consideration.

So given all of that, I don't believe that this factor favors either [M]other or [F]ather in any substantial way, with the understanding that if the father had majority physical custody of [Mother's] three children, they would have more time to spend with their young half-sibling.

So[,] to that extent, the factor may favor [F]ather, but only marginally.

The well-reasoned preferences of the child, of the [C]hildren based upon the [C]hildren's maturity and judgment.

Well, I spoke with the four children, [E.S.H.] being the oldest. His preference was clear, that he wanted to remain with [M]other primarily. He expressed his equivocal feelings about spending time with his father.

[S.S.H.] clearly expressed a strong preference to remain with her mother and, in fact, went out of her way to make it known to the court that she wanted nothing to do with [F]ather.

[B.C.H.], on the other hand, expressed an interest in living primarily with [F]ather. She did not indicate that that was because of any problems that she had with [M]other, and in fact she told the court that she was in a sense torn because she misses [F]ather when she is not with him and she misses [M]other when she is not with her. [W]ell, that's a reality of life for children of parents who have separated and divorced.

I will note that I believe that on the whole [B.C.H.] would opt to live with her father if she could, and I will also note that [M]other has indicated that that's okay with her if that's what [B.C.H.] wants to do.

[A.A.H.], the fourth child, indicated a preference for staying primarily with his mother and indicated that he did not like spending time at [Father's] house. He's the youngest of the four. So[,] I give less weight given his maturity and the manner in which he talked to the court than I do to his older siblings.

But I am not discounting it completely. So[,] this is sort of a mixed bag.

[W]ith regard to at least -- well, with regard to all of the [C]hildren but [B.C.H.], clearly they prefer staying with their mother most of the time. [B.C.H.] does not.

The court is concerned about having [B.C.H.] live with her father most of the time while the other children are living with their mother, but it strikes the court that whatever custody arrangements are ordered, it could be tailored so that [B.C.H.] could spend significant time with her siblings, sometimes when they're at [Father's], sometimes when they're at [M]other's.

That being said, for the most part the factor favors [M]other, with the exception of [B.C.H.], when it favors [F]ather.

The next factor is the attempts of a parent to turn the [C]hildren against the other parent, except in cases with domestic violence where reasonable measures are necessary to protect the child from harm.

[W]ell, the evidence I believe indicates that there have certainly been occasions when [M]other has spoken unkindly about [F]ather to the [C]hildren, but we also believe that is true of [F]ather and, frankly, we believe it is [F]ather to a greater extent. That's just one of the primary complaints of the [C]hildren. So[,] that factor favors [M]other.

Next factor is which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child adequate for the child's emotional needs.

I am concerned about the [C]hildren's reaction to staying with their father, with the exception of [B.C.H.]. I sense from the [C]hildren and from the other testimony I believe that there is a certain amount of estrangement that these three children, other than [B.C.H.], feel with regard to their father. I do not sense that with regard to their mother, and I don't sense that with regard to any of the four children and their mother, and that includes [B.C.H.].

Given that current situation, this factor, I believe, favors [M]other.

- 20 -

Which party is more likely to attend to the daily physical, emotional, developmental, educational, and special needs of the [C]hildren. I don't have any doubt that both parents can adequately attend to the daily physical, developmental, and educational -- well, to the physical and educational and development of the [C]hildren.

I didn't hear any evidence that any of the [C]hildren had special needs with the possible exception of [S.S.H.], regarding the traumatic incident involving her stepbrother. I am satisfied that [M]other has taken appropriate steps to have [S.S.H.] engage in a course of counseling and therapy regarding that situation that is ongoing.

So[,] when it came to the prior factor, I am concerned about the ability of [F]ather[,] at this present time[,] to be able to proactively attend to the [C]hildren's emotional needs, and I am not saying that he cannot do that or would not try to do that, but at least at the present time I think that [M]other is more likely to be able to do that and, therefore, this factor favors [M]other, with the exception of [B.C.H.], in which case I think that both parents are equally capable of attending to those needs given the lack of estrangement of [B.C.H.] from her father.

The proximity of the residences of the parties. It's about a 45-minute drive, basically suburban Harrisburg to the [C]ity of York. I don't think that really favors either party. It might not be a pleasant drive, but it is certainly not a drive that cannot be undertaken on a regular basis by both parents. So I don't think that favors either party.

Each party's availability to care for the [Children] or ability to make appropriate childcare arrangements. I don't think that factor favors either party. I am satisfied based upon what the parties told me and the other evidence that I believe that when the [C]hildren are in their care, if they can't care for them personally, they have appropriate arrangements to see that they are properly cared for. And at least the oldest two of them are pretty much getting to the age where they really don't need intensive, if any, childcare services.

The next factor is the level of conflict between the parties and the willingness and ability of the parties to cooperate with

each other. I have already alluded to this. There's a high level of conflict between these parents. While each one of them has expressed some willingness and ability to cooperate with one another, it's clear to me that to the extent they do that, it's the exception rather than the rule.

Frankly, I'm not sure they even bother listening to each other anymore. And I don't see from the evidence I believed that there's any light at the end of that particular tunnel.

So I, frankly, don't think that factor favors either parent.

The next factor is the history of drug or alcohol abuse by either party or member of the party's household.

I don't think that favors or disfavors either party. I am satisfied that by their testimony and the other evidence I believed that neither one of them has problems in those areas. So[,] that doesn't favor or disfavor either party. The mental and physical condition of a party or a member of a party's household. There is no evidence I found credible that indicates that this factor should favor one parent over the other.

CYF involvement. There certainly has been a lot of that. But for the incident involving [S.S.H.] and her stepbrother, it appears to the court that the other CYF involvement is more reflective of the parents' attitudes towards each other than anything else. Having said that, I don't think the evidence regarding CYF involvement favors or disfavors either party.

Any other relevant factor. I'm not sure there are any other relevant factors. I will comment on [F]ather's insistence that these children need a father in their life and that, in fact, his role as a father is somehow being put on the back burner.

I disagree with that. I am a father. I had a father. Neither I nor the law of Pennsylvania discounts the importance of a father to his children or the importance of a mother to her children. But when the parties have separated and, in the case of these parties, divorced and no longer make up a single household, unfortunately compromises have to be made. That's the nature of these cases.

I don't believe it would be in the best interests of these children at this point to remove them from the primary custody of their mother to [F]ather for a number of reasons, not only for educational stability, but also because of estrangement of three of the children from their father.

I believe [M]other when she indicates that the temporary living arrangements or the living arrangements she has are temporary and that, in fact, she will be securing residence in the Central York School District so the [C]hildren can continue their education in that school district without interruption.

I will say that if the only decision I had to make is which living arrangement at the present time better serves the [C]hildren or is more appropriate, I believe [F]ather's current situation is preferable to [M]other's current situation. But, again, I believed [M]other when she said that was temporary. And that, to me, is not a primary consideration because I'm also satisfied that although [M]other's situation is not as favorable as [F]ather's, it's okay and the [C]hildren are okay and are being cared for properly.

To [F]ather's credit, it sounds as if he has a very stable environment, has lived in the same townhouse for a number of years, is a veteran, has had very responsible jobs, is furthering his education, and I think he is sincere in his desire for wanting what is best for his children. But having all of the [C]hildren uprooted from the only real family situation that they have known and placed in the primary physical custody of [F]ather at this time is not in their best interest.

I believe that [F]ather, if he continues to have ongoing contact with his children, in the hopes that he will be able to start to bridge the gap that clearly exists between three of those children and him. Three of the four children are teenagers. Teenagers are tough under the best of circumstances. Frankly, I think these children have done fairly well given what I would say are less than the best of circumstances given the attitudes of their parents regarding each other.

I would urge both parents to at least temporarily set aside the animosity they hold for the other and give their children a break. I can't believe that either of these parents would not like to give these children an opportunity to enjoy their childhood

without all the drama that's being engendered by the antagonistic relationship that these parents have with each other. I don't think either parent has done a very good job of that.

I remind the parents it is their job to be the grownups. It's the [C]hildren's job to be children.

Now, look, I believe that with some changes the amended custody order of December 18, 2012[,] should remain in effect or should go back into effect.

That gives [D]ad [alternating] weekends during the school year, but more importantly it gives him half the summer. It gives him time for the [C]hildren to be settled down, get to know their father, and he them, in a more relaxed basis, and I think that's important, and I want that to continue.

Differences would be, I believe -- I was impressed, I was impressed by all the [C]hildren, but particularly by [B.C.H.] and the manner in which she described to me what she would like. I thought it showed a fair amount of maturity for a young lady. It is clear to me that so far, of all of the four children, she is the best at trying to negotiate the tricky path that her parents have created regarding their relationship.

Furthermore, I think, given the terms and conditions of the amended custody order, [B.C.H.] can still spend the entire summer with the other three children and spend every weekend with them, and I think that's, given their ages, I think that will be fine for her.

I'm going to go out on a limb here, and I'm not going to decide which parent ought to have sole legal custody. Generally speaking, the law is clear, if parents cannot cooperate at least to the extent to share in major decisions regarding their children, the court is to award sole legal custody regarding those decision-making prerogatives to one parent.

I'm hesitant to do that because I do not want either parent to have difficulty accessing the [C]hildren's medical or educational records or being able to participate in the [C]hildren's activities, including medical appointments, school meetings. It won't be too long before the 16-or 17-year-old

might want to be talking about college. So I'm going to continue it that way, fully knowing that I'm not sure it's going to succeed, but I would rather give the parents a chance for it to succeed.

[Mother] doesn't do everything that's best for these children; neither does [Father]. Maybe together, if only in a very limited and stilted way, they can at least communicate regarding major decisions, and their children they might come up with a better solution than either one of them might have on their own.

Now, I have made my decision. However, I will entertain comments either one of you has regarding whether in the context of the decision I have made the rest of the terms and conditions of the December 18, 2012 order are appropriate.

N.T., 10/26-27/16, at 255-272.

This Court has stated:

[t]he parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*S.M. v. J.M.*, 811 A.2d 621, 623 (Pa. Super. 2002) (quoting *Robinson v. Robinson*, 645 A.2d 836, 838 (Pa. 1994)).

After our careful review of the record, we find that the trial court's conclusions are not against the weight of the evidence or unreasonable in light of the sustainable findings of the trial court, which are supported by the evidence in the record. *C.R.F.*, 45 A.3d at 443. The trial court thoroughly considered, weighed, and explained its findings with respect to each of the section 5228(a) factors. Thus, we find Father is entitled to no relief on issues one, three, and four.

Next, we conclude that Father has waived issues, two, five, and nine, because those issues were not presented in his concise statement of errors complained of on appeal filed pursuant to Pa.R.A.P. 1925(a)(i)(2) and (b). *See Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the Statement of Questions Involved in his brief on appeal); *see also Greater Erie Indus. Development Corp. v. Presque Isle Downs, Inc.*, 88 A.3d 222, 224 (Pa. Super. 2014) (reiterating that the failure to comply with the minimal requirements of Pa.R.A.P. 1925(b) will result in automatic waiver of the issues raised) (citation omitted). However, even were we to assume Father preserved issues two and nine, we would find no impropriety in the trial court's questioning of the witnesses and the Children. As this Court has explained:

> It is well settled that a trial court always has the right, and sometimes even the duty to interrogate witnesses, in order to clarify evidence, or to elicit new information that is necessary to ensure a fair trial. A new trial is required, therefore, only when the trial judge's questioning amounts to an abuse of discretion. Because a charge of this nature is of the most serious type, however, the record must clearly show prejudice, bias, capricious disbelief or prejudgment before an abuse of discretion will be found.

*Fleck v. Durawood Inc.*, 529 A.2d 3, 5 (Pa. Super. 1987) (quoting *Pratt v. Stein*, 444 A.2d 674, 687 (Pa. Super. 1982)) (quotations and citations omitted).

Here, were we to reach these issues, we would conclude that there was no abuse of the trial court's discretion in questioning the witnesses and the Children, as the trial court was seeking to clarify the record concerning whether it was in the Children's best interests to modify custody. The trial court did not exhibit partiality, prejudice, bias, or ill will toward Father in its questioning.

Similarly, if Father properly preserved issue five, we would conclude that it lacks merit because the timing of Mother's marriage to Stepfather was of no significance to the trial court's decision on the best-interest factors. It is a challenge to the weight that the trial court afforded the evidence. Because we have already concluded that the trial court's decision was supported by competent evidence in the record in our discussion of issues one, three, and four, we discern no merit to this issue.

In issues six, seven, and eight, Father asserts that the trial court erred in failing to hold Mother in contempt for perjury, child endangerment, and failing to comply with the trial court's pretrial orders. With regard to the pretrial orders, the trial court stated that it did not find Mother in contempt, noting that Father did not request the trial court to do so. Trial Court Opinion, 12/27/16, at 5. This Court has held that issues not raised in the trial court are waived, and cannot be raised for the first time on appeal. *In re C.P.*, 901 A.2d 516, 522 (Pa. Super. 2006); Pa.R.A.P. 302.

More importantly however, the trial court's order denying Father's petition for contempt is not on appeal. Thus, these issues are not properly before this Court. *See In the Interest of M.B.*, 514 A.2d 599, 600 (Pa. Super. 1986) (stating that courts cannot rule on matters that are not properly before them).

For the reasons set forth above, Father is entitled to no relief. Accordingly, we affirm the October 31, 2016 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/22/2017